UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
GARY A. JACOBSON,

                                Plaintiff,

                - against -                                **OPINION AND ORDER**

                                                            No. 12-CV-8416 (CS)
CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.
----------------------------------------------------------------------x

Appearances:

Philip H. Seelig
Seelig Law Offices, LLC
New York, New York
*Counsel for Plaintiff*

Tomasina DiGrigolia
Special Assistant U.S. Attorney, Assistant Regional Counsel
Social Security Administration
New York, New York
*Counsel for Defendant*

Seibel, J.

        Plaintiff Gary Jacobson brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial

review of a final decision by Defendant Commissioner of Social Security ("Defendant" or the

"Commissioner"),[1] which found that Plaintiff was not entitled to a period of Disability or

Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").  (Complaint

("Compl."), Doc. 1, at ¶¶ 1-2.)  Before the Court are Plaintiff's Motion for Judgment on the

Pleadings, (Doc. 11), and Defendant's Cross-Motion for Judgment on the Pleadings, (Doc. 19).

For the reasons that follow, the decision of the Administrative Law Judge ("ALJ") is

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to
Federal Rule of Civil Procedure 25(d), Colvin should be substituted for Michael J. Astrue as the Defendant of
record.  The Clerk of Court is respectfully directed to amend the caption accordingly.

VACATED, and the case is REMANDED to the Commissioner for further consideration in light of this Opinion.

## I.  Background

### A.  Procedural History

Plaintiff protectively filed an application for DIB on May 6, 2009, claiming an inability to work as of December 6, 2008, due to a variety of medical conditions, including post-traumatic stress disorder ("PTSD"), major depressive disorder, chronic headaches, myofascial pain, causalgia, back pain and cervical spondylosis, disc bulging and kyphotic deformity, obstructive airway dysfunction, and limited range of motion in right wrist.  (Compl. ¶ 6.)

Plaintiff's application was initially denied on November 6, 2009 based on a finding that Plaintiff could perform light exertion work.  (R. 81.)[2]  On March 17, 2011, a hearing was conducted by video conference with ALJ Dennis G. Katz presiding.  (*Id.* at 75.)  On April 18, 2011, ALJ Katz issued an unfavorable opinion finding that Plaintiff was not disabled within the meaning of the Act.  (*Id.* at 85.)   On September 27, 2012, the Appeals Council concluded that there was no basis under Social Security regulations to grant Plaintiff's request for review, thus rendering the ALJ's decision the final determination of the Commissioner.  (*Id.* at 1.)

### B.  Non-Medical Evidence

Plaintiff was born February 22, 1968 and was thirty-nine years old at the time he applied for DIB.  (P's Mem. 1.)[3]  Plaintiff graduated from high school, (R. 206), and had work experience as a bartender from 1993 to 1997 and as a firefighter for the New York Fire Department (the "Fire Department" or "FDNY") from 1997-2007, (*id.* at 220-22).  As a

---

[2] "R." refers to the Record of the Social Security Administration ("SSA"), which was filed under seal with this Court.  (Doc. 7.)

[3] "P's Mem." refers to the Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings. (Doc. 13.)

firefighter, Plaintiff had to walk and stand for three hours each, climb for one hour, and sit for two hours in a nine-hour workday.  (*Id.* at 221.)  Plaintiff also had to handle, grab and grasp large objects for approximately thirty minutes each day.  (*Id.*)  Plaintiff frequently lifted twenty-five pounds, and the heaviest weight he lifted was one hundred pounds or more.  (*Id.*)

On September 30, 2007, Plaintiff was injured at work when he was trapped in a burning building and had to fall out of a three-story window to safety.   (*Id.* at 540.)  After this incident, Plaintiff was placed by the Fire Department on "light duty", (*id.* at 82), which consisted of answering the telephone, taking messages and performing other clerical tasks during a seven- to eight-hour shift, (*id.*).  While on light duty, Plaintiff took a commuter train from Peekskill, New York into Grand Central Terminal and then took the subway to Brooklyn.  (*Id.* at 94-95.)  On October 17, 2008, the FDNY deemed Plaintiff unfit for work as a firefighter, (*id.* at 400), and he was forced to retire on December 6, 2008, (*id.* at 82).  Plaintiff has not done any other work since December 6, 2008.  (*Id.* at 77.)

Plaintiff lives in a house with his wife and three children, who were aged seven, five and two at the time of the hearing.  (*Id.* at 100.)  Plaintiff's wife stays home with him and the children, but Plaintiff is able to assist with "light chores" and watching and playing with the children.  (*Id.*)  Plaintiff also reads and watches television while at home, and he can make simple meals for himself.  (*Id.* at 99-100)  Although Plaintiff can drive, he is only able to drive short distances before he needs to get up and stretch to alleviate his back pain.  (*Id.* at 96.)

Plaintiff can sit for twenty minutes at a time, and after that he must stand and stretch to avoid pain in his back.  (*Id.*)  Plaintiff also has difficulty walking for a long period of time and has trouble sleeping.  (*Id.*)  Plaintiff is prescribed various pain medications for his back pain, which he tries to take no more than four times per week because the medication "affect[s] [his]

sleeping" and "make[s] [him] nauseous." (*Id.* at 105-06.)  Plaintiff underwent physical therapy

for his wrist, which was injured in his September 2007 fall, (*id.* at 93), and has regained what

Plaintiff estimates as fifty percent range of motion, (*id.* at 97-98).  Finally, Plaintiff has

respiratory issues, including sinusitis, and his sinuses are irritated by dust and household

cleaners. (*Id.* at 105.)  Plaintiff takes Nasonex to help with his symptoms and also uses a Neti

pot. (*Id.* at 107.)

Plaintiff also suffers from PTSD, which he developed after participating in rescue and

recovery at the World Trade Center after September 11, 2001, and for which he takes several

medications, including Lexapro, Abilify, Hydroxyzine, and Provigil. (*Id.* at 103-04.)  Plaintiff

alleges that his September 2007 fall aggravated his PTSD, and now he suffers from "severe

depression, anger, and . . . hopelessness." (*Id.* at 103.)

*C.  Medical Evidence*

1.  Dr. Christina Pansarasa

Dr. Pansarasa, a psychologist, met with Plaintiff's family nine times from January to

November 2008 for family therapy sessions focused on Plaintiff's eldest son. (*Id.* at 476.)  She

submitted a report, dated June 24, 2009, which summarized her observations of Plaintiff during

therapy. (*Id.*)  During that time, Plaintiff described the symptoms he had been experiencing,

which Dr. Pansarasa noted were consistent with PTSD. (*Id.*)  Plaintiff indicated that he had been

suffering from these symptoms since his September 2007 injury. (*Id.*)  Dr. Pansarasa noted that

Plaintiff exhibited persistent irritability, negativity, anger, disengagement from his family,

excessive sleeping, difficulty enjoying positive experiences, and excessive focus on the events

surrounding his injury. (*Id.*)

2.  Dr. Sylvio Burcescu

Dr. Burcescu, Plaintiff's treating psychiatrist, (*id.* at 103), submitted a report dated February 10, 2011, (*id.* at 294).[4]  The report contains a check-list, which asks the doctor to rate the patient's ability to make certain occupational adjustments.  (*Id.*)  Dr. Burcescu found that Plaintiff's ability to use judgment was very good, and that his ability to follow work rules and interact with supervisors was limited.  (*Id.*)  For the remainder of the occupational adjustments, however – ability to relate to co-workers, deal with the public, deal with work-stresses, function independently and maintain attention and concentration – Dr. Burcescu opined that Plaintiff had "no useful ability to function."  (*Id.*)  He also noted, among other things, that Plaintiff's lack of energy would limit his ability to adjust to a job, (*id.*), and that Plaintiff would be unable to complete job instructions, (*id.* at 295).  Dr. Burcescu diagnosed Plaintiff with major depression and PTSD.  (*Id.* at 294.)

3.  Dr. Michael Hearns

Dr. Hearns, a physician, treated Plaintiff from April 1, 2009 until December 1, 2010. (*See id.* at 546-49.)  Plaintiff was initially treated for right wrist pain and loss of motion and strength, mid-back pain, right shoulder pain, weakness in the right arm and PTSD-like symptoms.  (*Id.* at 546.)  Plaintiff complained that he could only stand and/or walk for less than one hour without needing a fifteen to twenty minute break; could not sit comfortably for more than two hours; had difficulty climbing stairs; could only lift and carry objects weighing up to ten pounds for a period of two and a half hours; and could only carry three-pound objects for any period of time greater than two hours.  (*Id.* at 546-47.)

---

[4] Dr. Burcescu's report bears his signature, but not his medical title.  (R. 297.)

In his report, Dr. Hearns summarized Plaintiff's medical history since his September 2007 injury.  Immediately after Plaintiff was injured he was given several CT scans and x-rays, all of which were unremarkable except for a CT scan of his chest, which revealed small pneumothorax and multiple rib fractures, and a CT scan of Plaintiff's right wrist, which revealed a comminuted fracture of the distal radius.  (*Id.* at 547.)  Shortly thereafter, Dr. Andrew Weiland performed surgery on Plaintiff's wrist.  (*Id.*)

In January 2008, Plaintiff had x-rays of his right wrist that revealed his distal radius fracture was unchanged from the initial injury.  (*Id.* at 548.)  The same month, a neurological report indicated that an EMG/NCV study was performed on Plaintiff, revealing neurophysiologic evidence of a median sensory neuropathy on Plaintiff's right side.  (*Id.*)  The treating physician recommended further physical therapy and occupational therapy to treat Plaintiff's right hand.  (*Id.*)  Dr. Weiland's June 2008 report indicated that Plaintiff's wrist fracture had healed in satisfactory position and alignment, although he opined that Plaintiff likely would not be a good candidate for active duty at the Fire Department.  (*Id.*)

Dr. Hearns initially evaluated Plaintiff on April 1, 2009.  (*Id.*)  A neck examination demonstrated multiple trigger points and muscle spasms upon palpation, as did an examination of Plaintiff's mid-back.  (*Id.*)  Dr. Hearns noted that Plaintiff's back, right wrist and right shoulder exhibited limited range of motion (80%, 20% and 50% normal, respectively).  (*Id.* at 548-49.)  At that time, Dr. Hearns diagnosed Plaintiff with status post right wrist fracture, impingement of the right shoulder, and status post head trauma with headaches and PTSD.  (*Id.* at 549.)  He opined that Plaintiff's disability status was "total," and that Plaintiff was a good candidate for Social Security Disability.  (*Id.*)

Dr. Hearns saw Plaintiff again in November 2009, and Plaintiff complained that his PTSD symptoms were worsening.  (*Id.*)  Plaintiff reported that he had started psychotherapy, and by his next visit with Dr. Hearns in January 2010, he had also started taking antidepressants. (*Id.*)  At the January 2010 consultation, at which Plaintiff expressed he was having difficulty sleeping, Dr. Hearns recommended that Plaintiff continue seeing a psychotherapist and taking antidepressants.  (*Id.*)

Plaintiff had another consultation with Dr. Hearns in March 2010, at which he demonstrated improved range of motion of his wrist.  (*See id.*)  By Plaintiff's August 2010 examination, his right wrist demonstrated 70% normal range of motion.  (*Id.*)  Dr. Hearns' last documented visit with Plaintiff was on December 1, 2010.  (*Id.*)  At that time, Plaintiff reported that his depression and anger had improved 80%, although he still had back pain that was 8 out of 10 in intensity.  (*Id.*)

In his report dated February 21, 2011, Dr. Hearns concluded that Plaintiff suffered a full disability in September 2007, and Plaintiff's "conditions, clinical findings and diagnostic testing establish a long standing total and permanent condition, one that did not develop recently."  (*Id.*) Dr. Hearns diagnosed Plaintiff with depression, internal derangement of the right wrist and herniated nucleus pulposus of the lumbar spine.  (*Id.* at 550.)  Dr. Hearns opined that Plaintiff's medical condition prevents him from participating in any form of gainful employment and that Plaintiff's conditions are permanent and will likely not improve with future treatment.  (*Id.*)

In a form that was submitted with his narrative report, Dr. Hearns was asked to assess Plaintiff's ability to do sedentary work.  Dr. Hearns indicated that during an eight-hour shift, Plaintiff would be able to stand and/or walk for less than one hour and sit for less than two hours. (*Id.* at 551.)  Finally, Dr. Hearns was also asked to check off the limitations that would interfere

with Plaintiff's ability to work during an eight-hour day.  (*Id.* at 552.)  Dr. Hearns checked off

every limitation offered, including "requires bed rest during the work day," "requires frequent

breaks during the work day," "requires medications that interfere with [his] inability to function

in the work setting," and "would have difficulty concentrating on [his] work."  (*Id.*)

   D.  *Consultative Evaluations*

      1.  <u>Dr. Carrie Colwes Hymowitz</u>

   On July 31, 2009, Dr. Hymowitz conducted a consultative psychological evaluation of

Plaintiff.  (*Id.* at 479-84.)  Plaintiff reported that his forced retirement was very difficult for him,

and he felt "extremely sad and depressed" as a result.  (*Id.* at 479.)  Plaintiff indicated that after

his September 2007 accident, he had a very difficult time adjusting and could not sleep through

the night because of physical discomfort.  (*Id.*)  He further stated that he generally feels

depressed during the day, has trouble concentrating, and is not interested in socializing.  (*Id.* at

480.)  Plaintiff also mentioned that he occasionally has trouble breathing, although he did not

know if this was a result of anxiety or pulmonary function difficulty.  (*Id.*)

   Dr. Hymowitz reported that Plaintiff's gait, posture, appearance and behavior were

normal, although his grip with his right hand was impaired.  (*Id.* at 481.)  She also noted that

Plaintiff's demeanor and responsiveness was "extremely cooperative and very open," (*id.*), and

his concentration appeared to be good, (*id.* at 482).  Dr. Hymowitz noted that Plaintiff is able to

dress, bathe, and groom himself, drive, and take public transportation, but has difficulty cooking

and preparing meals.  (*Id.*)

   Finding that Plaintiff could "follow and understand simple directions and instructions,

perform simple tasks independently, . . . maintain attention and concentration with the exception

of some distraction based on physical discomfort," learn new tasks, perform complex tasks

independently, make appropriate decisions, relate adequately with others and appropriately deal with stress, Dr. Hymowitz concluded that Plaintiff did not present "any cognitive problems that would significantly impair [Plaintiff's] ability to function on a daily basis." (*Id.* at 483.) Dr. Hymowitz did find, however, that Plaintiff's psychiatric problems could potentially significantly interfere with Plaintiff's ability to function. (*Id.*) Dr. Hymowitz's diagnosis was that Plaintiff suffered from PTSD and adjustment disorder with depressed mood. (*Id.*) She recommended that Plaintiff continue psychiatric treatment and book an appointment with a psychologist. (*Id.* at 484.)

2.  Dr. Suraj Malhotra

On August 5, 2009, Dr. Malhotra performed a consultative orthopedic examination of Plaintiff. (*Id.* at 485-88.) Plaintiff, who is right-handed, reported that he has had intermittent pain in his right shoulder and in his right wrist since his September 2007 accident. (*Id.* at 485.) His shoulder pain is sharp – approximately 3 out of 10 in intensity – and worse on rotating his arm to his back. (*Id.*) His wrist pain – which is approximately 7 out of 10 in intensity – gets worse depending on how Plaintiff moves his wrist. (*Id.*) Plaintiff also indicated that he has persistent, sharp pain in his back – approximately 4 out of 10 in intensity – that gets worse when Plaintiff bends, stands or sits for an extended period of time. (*Id.*) Plaintiff stated that because of his wrist injury he does not cook, clean or do laundry, although he shops once a week, and showers and dresses himself daily. (*Id.* at 486.)

Regarding Plaintiff's medical history, Dr. Malhotra noted that Plaintiff had surgery on his right wrist after his September 2007 injury. (*Id.* at 485.) He also noted that Plaintiff had suffered from PTSD since 2007, the year Plaintiff was injured, and that he was seeing a

psychiatrist.  (*Id.*)  His list of medications at the time of the evaluation included Nabumetone,

Baclofen, Tramadol, Aleve, Motrin, Lexapro and Abilify.  (*Id.* at 486.)

Dr. Malhotra reported that Plaintiff's gait, squat, and station were normal, and Plaintiff

could walk on his heels and toes without difficulty.  (*Id.*)  He further indicated that Plaintiff did

not need any help changing for the exam, rising from his chair, or getting on and off the exam

table.  (*Id.*)  Dr. Malhotra noted that Plaintiff's hand and finger dexterity were intact, and his grip

strength was 5 out of 5 bilaterally.  Plaintiff did not exhibit any cervical or paracervical pain or

spasm or any trigger points.  (*Id.*)  Dr. Malhotra found that Plaintiff had full range of movement

of his shoulders, elbows, and left wrist, and somewhat limited range of movement in his right

wrist.  (*See id.* at 487.)  He found that there was pinprick hypoesthesia over the palmar aspect of

Plaintiff's right hand and fingers.  Concerning Plaintiff's thoracic and lumbar spine, no spinal or

paraspinal tenderness, joint or sciatic notch tenderness, spasm, scoliosis, kypohsis, or trigger

points were found.  Plaintiff also exhibited full range of movement of his hips, knees and ankles

bilaterally, and no muscle atrophy, joint effusion, inflammation, or instability, although he did

exhibit mild pinprick hypoesthesia of his right calf.  (*Id.*)

Dr. Malhotra diagnosed Plaintiff with mild obesity (Plaintiff was 5'11" and 228 pounds),

PTSD based on his history, status post-fracture of the right radius at wrist, status post fracture of

Plaintiff's thoracic spine in the T9 vertebrae, and pain in his right shoulder.  (*Id.*)  He concluded

that Plaintiff's prognosis was good, and found that Plaintiff has only a "mild limitation of [the]

right wrist bending and lifting heavy objects with the right hand."  (*Id.*)

3.  Dr. J. Alpert

Dr. Alpert, a state agency psychiatric consultant, submitted a psychiatric review

technique "check-off" form dated November 4, 2009.  (*Id.* at 489-504.)  Dr. Alpert diagnosed

Plaintiff with an adjustment disorder with depressed mood, (*id.* at 494), and PTSD, (*id.* at 496). He concluded that Plaintiff was not restricted in activities of daily living, had no difficulties maintaining social functioning, and had no episodes of deterioration, but that Plaintiff had moderate difficulty maintaining concentration.  (*Id.* at 501.)  Dr. Alpert provided no explanation as to how he reached any of these conclusions, nor did he provide a narrative report.

### E.  The ALJ's Decision

By decision dated April 18, 2011, ALJ Katz determined that Plaintiff was not disabled within the meaning of the Act and denied Plaintiff's claim.  (*Id.* at 85.)  Specifically, the ALJ found that although Plaintiff had not engaged in substantial gainful activity since his alleged onset date and had severe physical health impairments – but not mental health impairments – the impairments were not severe enough to render him disabled.  (*See id.* at 75-81.)  The ALJ further determined that Plaintiff had a residual functional capacity to perform "light work," such as the type of work he performed while on light duty for the FDNY (*i.e.*, office/reception work).  (*Id.* at 81-85.)

In reviewing Plaintiff's disability claim, the ALJ noted that he considered the objective medical evidence set forth in the record, Plaintiff's subjective accounts of his symptoms, and the opinions offered by the consultative examiners and state agency medical records.  (*Id.* at 77-84.) The ALJ concluded that Plaintiff was not very credible given that he was able to return to work a few months after his September 2007 accident and perform office/receptionist work.  (*Id.* at 84.) In making this credibility determination, the ALJ also considered Plaintiff's daily activities; the distance he traveled to work after his injuries and his use of public transportation; and the inconsistencies between Plaintiff's testimony concerning his mental health and the other medical evidence in the record.  (*Id.* at 79-84.)  Specifically, the ALJ emphasized that although Plaintiff

attributed his PTSD to his participation in the rescue effort at the World Trade Center on September 11, 2001, there was no evidence in the administrative record that Plaintiff was present at the site or that Plaintiff had previously been diagnosed with PTSD, with the exception of Dr. Pansarasa's diagnosis.  (*Id.* at 79.)

In conclusion, ALJ Katz found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[, but that] [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with [Plaintiff's] residual functional capacity."  (*Id.* at 84.)

Because the ALJ's decision was rendered the final decision of the Commissioner, it is subject to review in this federal court action, which Plaintiff commenced on November 16, 2012. (Doc. 1.)

## II.  <u>Legal Standards</u>

### A.  *Standard of Review*

An unsuccessful claimant for benefits under the Act may seek judicial review in federal court of the Commissioner's denial of the application for such benefits.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of review in an appeal from a denial of social security involves two levels of inquiry.  The court must first evaluate whether the Commissioner applied the correct legal standard in determining that the plaintiff was not disabled.  *See Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).  "Failure to apply the correct legal standards is grounds for reversal" of the ruling.  *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir. 1984).

Upon a conclusion that the Commissioner applied the correct legal standard, the court must decide whether there exists in the administrative record substantial evidence to support the

Commissioner's decision.  *See Green-Younger v. Barnhart,* 335 F.3d 99, 105-06 (2d Cir. 2003).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402

U.S. 389, 401 (1971) (internal quotation marks and citations omitted).  When evaluating whether

substantial evidence in the record supports the Commissioner's decision, it is important that the

court "carefully consider[] the whole record, examining evidence from both sides."  *Tejada,* 167

F.3d at 774 (citing *Quinones v. Chater,* 117 F.3d 29, 33 (2d Cir. 1997)).  "It is not the function of

a reviewing court to decide *de novo* whether a claimant was disabled."  *Melville v. Apfel,* 198

F.3d 45, 52 (2d Cir. 1999).  If the "decision rests on adequate findings supported by evidence

having rational probative force, [the court] will not substitute [its own] judgment for that of the

Commissioner."  *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002).  Additionally, the ALJ

"has an obligation to develop the record in light of the non-adversarial nature of the benefits

proceedings, regardless of whether the claimant is represented by counsel."  *Shaw v. Chater*, 221

F.3d 126, 131 (2d Cir. 2000).

 Should the court find a lack of substantial evidence for the Commissioner's findings, it

has two options.  If there are gaps in the administrative record or the ALJ has applied an

improper legal standard, the court may remand the case for further development of the evidence.

*See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).  If, however, the record provides

"persuasive proof of disability and a remand for further evidentiary proceedings would serve no

purpose," the court may reverse and remand solely for the calculation and payment of benefits.

*Id.*; *see Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 44 (2d Cir. 1972).

B. *Determining Disability*

In the context of a claim for a DIB, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3)(A).  A person will be found disabled if his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).  Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow in evaluating a claim for DIB.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4).

The Commissioner first considers whether the claimant is engaged in "substantial gainful activity."  *Id.* §§ 416.920(a)(4)(i), (b).  If the claimant is so engaged, then the Commissioner will conclude that the claimant is not disabled.  *Id.*  The second consideration in the Commissioner's determination is the medical severity of the claimant's impairment.  *Id.* § 416.920(a)(4)(ii).  To qualify as having a severe impairment, a claimant must establish that he has an "impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities."  *Id.* § 416.920(c).  If it is determined that the claimant suffers from a severe impairment, the Commissioner will decide if the impairment meets or equals one of the impairments presumed severe enough to render one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations.  *See id.* §§ 416.920(a)(4)(iii), (d).  If the claimant's impairment is not on the list, the Commissioner evaluates the claimant's residual functional capacity, taking into consideration all of the relevant evidence.  *See id.* § 416.920(e).  Fourth, the

Commissioner decides whether the claimant can do his past relevant work. *See id.*

§§ 416.920(a)(4)(iv), (e)-(f).  Finally, if the Commissioner finds that the claimant cannot do his

past relevant work, the Commissioner will then consider the claimant's residual functional

capacity, age, education, and work experience to see if he can make an adjustment to other work.

*See id.*  §§ 416.920(a)(4)(v), (g).

   The claimant bears the burden of proof on the first four steps of this analysis. *See*

*DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted).  If, during one of

the first four steps of the analysis, the ALJ concludes that the claimant is not disabled, then he or

she need not proceed with the remaining steps of the analysis.  *See Williams v. Apfel,* 204 F.3d

48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to

show that the claimant is capable of other work.  *DeChirico*, 134 F.3d at 1180 (citation omitted).

## III.  <u>Analysis</u>

   Plaintiff contends that the ALJ committed several errors in his decision denying benefits.

Specifically, Plaintiff argues that the ALJ erred when he (1) improperly weighed the evidence

submitted by his treating physicians, (2) failed to develop the record concerning Plaintiff's

psychological treatment, (3) improperly evaluated Plaintiff's credibility and allegations of pain,

and (4) erroneously determined that Plaintiff retained the ability to perform light and sedentary

work.  (P's Mem. 9-21.)

### A.  *Plaintiff's Mental Impairment*

   Plaintiff argues that ALJ Katz overlooked Plaintiff's prior PTSD diagnosis and other

objective medical evidence and erroneously determined that Plaintiff's PTSD did not constitute a

severe impairment.  (*Id.* at 11.)  The Commissioner contends that the ALJ fully addressed the

evidence concerning Plaintiff's mental condition and was "not required to explicitly reconcile every shred of conflicting evidence."  (D's Mem. 13.)[5]

It is true that an ALJ is not required to reconcile every conflicting piece of evidence when making his or her determination of disability.  *See Ahern v. Astrue*, No. 09-CV-5543, 2011 WL 1113534, at *6 (E.D.N.Y. Mar. 24, 2011) (collecting cases).  Yet ALJ Katz appears to have overlooked entirely substantial evidence in the record that corroborates Plaintiff's testimony and his subjective accounts of his symptoms.  For example, ALJ Katz noted that "[t]he administrative record contains no evidence that the claimant was present at the site of the World Trade Center in New York City at the time of the attack or at the time of the recovery effort, nor does it contain any evidence that the claimant ever mentioned to any medical source that he was somehow involved in the event."  (R. 79.)  There is, however, objective evidence establishing that Plaintiff helped with rescue and recovery efforts at the World Trade Center after September 11, 2001, that he reported this involvement to various physicians, and that he developed PTSD (as well as a respiratory ailment) as a result.  (*See, e.g.*, *id.* at 402 (letter dated October 17, 2008 from Dr. Kevin Kelly, Chief Medical Officer of the FDNY, stating, "[Plaintiff] has also had symptoms of PTSD.  Initially he had worked in rescue and recovery at the World Trade Center. . . .  He had sought [counseling] assistance after 9/11 and again after [his September 2007 accident]."); *id.* at 407 ("Last worked the [World Trade Center] site November 2001.").)

Moreover, noting that Plaintiff had neither mentioned his mental health issues to his physicians nor sought counseling, ALJ Katz found that "there is no objective medical evidence of a 'severe' emotional component" in Plaintiff's medical history.  (*Id.* at 79.)  The ALJ, however, overlooked the abundance of evidence to the contrary.  Not only did Plaintiff seek

[5] "D's Mem." refers to the Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings.  (Doc. 20.)

counseling after both September 11 and his September 2007 injury, (*see, e.g.*, *id.* at 104 ([ALJ:] "You had a PTSD situation before your injury?  [Plaintiff:]  "I sought the counseling unit . . . and I just went . . . from 9/11."); *id.* at 402 (Dr. Kelly's medical report states that Plaintiff "sought assistance after 9/11 and again after this incident with professional counseling services and he is under the care of Dr. Kevin Kelly and currently on medication.")), but he also reported that he suffered from PTSD to every physician who examined him.  Along the same lines, the ALJ incorrectly states that the only reference to mental illness in Plaintiff's prior medical record was Dr. Pansarasa's diagnosis.[6]  The record shows, however, that, among other doctors, Dr. Hearns, Plaintiff's treating physician from April 1, 2009 until December 1, 2010, and Dr. Burcescu, Plaintiff's treating psychiatrist, both diagnosed Plaintiff with PTSD.  (*Id.* at 294, 549.)

The ALJ did not give Dr. Burcescu's report any evidentiary weight because Dr. Burcescu did not identify himself as a physician; the report set forth no narrative basis for its "highly conclusory" findings; and the report was written on the eve of the hearing.  (*Id.* at 80.)  Plaintiff, however, testified at the hearing that Dr. Burcescu was his treating psychiatrist and that he had diagnosed Plaintiff with PTSD that manifested itself in "severe depression, anger, and . . . hopelessness."  (*Id.* at 103 ([Attorney]:  "[A]re you still treating [*sic*] for PTSD?"  [Plaintiff:]  "Yes, sir."  [Attorney:]  "Who are you treating with?"  [Plaintiff:]  Dr. Silvio Buscecu [*sic*]."  [Attorney:]  "And is that doctor a psychologist or a psychiatrist?"  [Plaintiff:]  "Yes, sir, psychiatrist.").)  Plaintiff further identified Dr. Burcescu as a doctor in his "Disability Report-

---

[6] ALJ Katz did not give Dr. Pansarasa's diagnosis much evidentiary weight because Dr. Pansarasa saw Plaintiff in the context of family therapy that was centered on Plaintiff's eldest son.  (R. 79.)  That Dr. Pansarasa treated Plaintiff in the context of family therapy does not, it seems to the Court, disqualify her as a treating psychologist.  Dr. Pansarasa saw Plaintiff nine times, which gave her many opportunities to monitor both Plaintiff's interactions with his family and his behavior.  As Dr. Pansarasa's diagnosis is consistent with the other substantial evidence in the record, it is entitled to controlling weight.  *See Salisbury v. Astrue*, No. 06-CV-6629, 2008 WL 5110992, at *4 (W.D.N.Y. Dec. 2, 2008) ("A treating physician's opinion is given controlling weight where it is well-supported by the medical evidence and is not inconsistent with other substantial evidence in the record.") (citing 20 C.F.R. §§ 416.927(d)(2), 416.1527(d)(2)).

Appeal," which is part of the administrative record.  (*See id.* at 233.)  Plaintiff noted that he had

an ongoing doctor-patient relationship with Dr. Burcescu, who began treating him for PTSD on

April 10, 2009.  (*Id.*)  Although Dr. Burcescu inadvertently omitted his medical title from his

report, that omission did not give the ALJ license to disregard Plaintiff's testimony and the

objective evidence establishing the nature of Dr. Burcescu's doctor-patient relationship to

Plaintiff.  If the ALJ was confused about Dr. Burcescu's relationship to Plaintiff, he had an

obligation to inquire further and develop the evidentiary record.  *See Perez v. Chater*, 77 F.3d 41,

47 (2d Cir. 1996) (ALJ has affirmative obligation to develop the medical record even where

claimant is represented by attorney) (citing 20 C.F.R. § 404.1512(e) ("When the evidence we

receive from your treating physician . . . or other medical source is inadequate for us to

determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . or

other medical source to determine whether the additional information we need is readily

available.")); 20 C.F.R. § 404.1512(d) ("Before [the SSA] make[s] a determination that you are

not disabled, [it] will develop [the claimant's] complete medical history[.]").  Further, although

Dr. Burcescu's report is admittedly cursory, it does provide a basis for his mental impairment

findings, such as Plaintiff's irritability, lack of energy, and inability to complete simple chores,

maintain attention and concentration, and function independently.  Finally, Dr. Burcescu's report

is dated February 10, 2011, five weeks before the hearing; the Court is aware of no reason why

such a report should be discounted.

Dr. Hearns, Plaintiff's treating physician, also diagnosed Plaintiff with PTSD and

concluded that Plaintiff "requires medications that interfere with [his] ability to function in the

work setting" and that Plaintiff "would have difficulty concentrating on [his] work."  (*Id.* at 552.)

As Dr. Hearns' report focuses more on Plaintiff's physical ailments, it does not need to be

accorded controlling weight in the mental health context, but should be considered in connection with the other evidence in the record.

Moreover, Dr. Kelly, the FDNY's Chief Medical Officer, also noted that Plaintiff has symptoms of PTSD as a result of his experience at the World Trade Center and that that condition was further aggravated by his September 2007 injury.  (*Id.* at 402.)  In his report to the FDNY Fire Commissioner, Dr. Kelly concluded that Plaintiff was "unfit for fire duty" because "he is not expected to have any further improvement in his symptoms."  (*Id.*)[7]  ALJ Katz noted that he considered Dr. Kelly's disability determination, but it was not binding.  (*Id.* at 82.)  Even the consultative physician, Dr. Hymowitz, diagnosed Plaintiff with PTSD and concluded that Plaintiff's psychiatric problems could potentially significantly interfere with his ability to function.  (*Id.* at 483.)  ALJ Katz, however, similarly disregarded her report, which he said was based solely on Plaintiff's "self-report during a one-time consultative examination."  (*Id.* at 79.)

The Commissioner argues that even if the ALJ overlooked the evidence supporting Plaintiff's testimony regarding his PTSD, it does not affect the ALJ's determination that Plaintiff can perform his past relevant work because he had been working as a firefighter since he was diagnosed with PTSD in 2001.  (D's Mem. 20.)  While Plaintiff did continue working after 2001, he testified that his PTSD was further aggravated as a result of his September 2007 accident, and he did not work as an active firefighter thereafter.  (R. 104.)  Plaintiff did return to "light duty" for a short period of time after his injury, but he was responsible for answering only two to three phone calls per hour, (*id.* at 101), and was permitted to lay down on a cot for at least two hours of a seven- to eight-hour shift, (*id.* at 102-03).  Further, because the ALJ disregarded much of the objective medical evidence in the record, he may have erroneously determined that Plaintiff can

---

[7] It is unclear from Dr. Kelly's report whether he is referring to improvement in Plaintiff's physical condition, mental impairments, or both.

"(a) understand instructions, (b) respond to supervision and (c) deal with changes in a routine work setting," which are, according to Social Security regulations, the basic mental demands of competitive, remunerative, unskilled work.  (*See id.* at 80.)  Indeed, both Dr. Burcescu's and Dr. Hearn's reports indicated that Plaintiff's mental impairments could interfere with Plaintiff's ability to understand job instructions, maintain attention and concentration, and interact appropriately in social situations, all of which could prevent Plaintiff from returning to light level exertion of the type that ALJ Katz recommended.

ALJ Katz seems to have "jumped to conclusions that were not adequately supported by the consultant reports" before him, *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999), and his failure to examine all the evidence presented contributed to his – perhaps erroneous – findings that Plaintiff was not credible and his mental impairments were not severe, *see id.* at 78-83 (remanding with specific instructions to, among other things, secure additional medical records, request an explanation from a treating physician regarding his disability diagnosis, and reassess the claimant's testimonial credibility).  Accordingly, this case shall be remanded to the Commissioner for reassessment of Plaintiff's credibility in light of the evidence discussed above; reweighing of the evidence presented by Plaintiff's treating physicians; and development of the record as may be needed.

B.  *Plaintiff's Physical Impairments*

The ALJ found that Plaintiff had the following severe impairments:  "an impairment of the claimant's cervical and thoracic spines; a right shoulder impairment[;] and an impairment of the right wrist."  (R. 77.)  Finding that Plaintiff's impairments did not meet or equal one of the impairments presumed severe enough to render one disabled, ALJ Katz evaluated Plaintiff's

residual functional capacity and concluded that Plaintiff could perform light level exertion work. (*Id.* at 81-85.)

Plaintiff contends that in making his determination, ALJ Katz failed to properly consider the evidence submitted by Plaintiff's treating physician, Dr. Hearns, and erroneously concluded that Plaintiff could perform sedentary work.  (P's Mem. 13-14, 19-21.)  ALJ Katz noted that he considered Dr. Hearns' opinion, but did not afford it much weight because Dr. Hearns' opinions were not retrospective or based on any specific medical evidence.  (R. 84.)  The Commissioner contends that the ALJ properly evaluated Dr. Hearns' opinion and correctly concluded it was not credible because Dr. Hearns' findings indicate Plaintiff was not as limited as Dr. Hearns claimed and his assessment was inconsistent with Dr. Malhotra's opinion.  (D's Mem. 21-22.)

The treating physician rule provides that an ALJ should defer "to the views of the physician who has engaged in the primary treatment of the claimant."  *Green-Younger*, 335 F.3d at 106.  "A treating physician's statement that the claimant is disabled cannot itself be determinative," *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999), but a treating physician's opinion will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," 20 C.F.R. § 404.1527(c)(2).

An ALJ "cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa*, 168 F.3d at 78-79 (internal quotation marks omitted).  When the ALJ refuses to accord the treating physician's opinion "controlling weight," the ALJ "must consider various factors to determine how much weight to give to the opinion," including:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion

is from a specialist; and (v) other factors brought to the [SSA]'s attention that tend to support or contradict the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)).

Once the ALJ considers the above factors, he must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Id.* at 33; *see* 20 C.F.R. § 404.1527(c)(2) (agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion"). If the ALJ fails to provide such "good reasons," the district court may remand. *Snell*, 177 F.3d at 133; *see also Schaal*, 134 F.3d at 505 ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

As stated above, ALJ Katz did not afford Dr. Hearns' opinion much weight because he erroneously concluded that Dr. Hearns' opinions were "not retrospective [or] based on any specific medical evidence." (R. 84.) ALJ Katz did not provide any explanation for his assertion, nor can I find one, as Dr. Hearns' report relies on specific clinical and diagnostic evidence, such as CT scans, x-ray results, MRI scans, and several physical examinations. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). Further, the ALJ did not consider the factors delineated in 20 C.F.R. § 404.1527(c)(2), or provide any explanation other than the quoted conclusory remark. Further, even if Dr. Hearns' report was not based on specific medical evidence, it was the ALJ's duty to seek additional information from Dr. Hearns *sua sponte*. *See Perez*, 77 F.3d at 47 ("[T]he ALJ generally has an affirmative obligation to develop the administrative record . . . even when the claimant is represented by counsel . . . ."). Moreover, Dr. Malhotra's report, on which ALJ Katz seems to rely, (*see* R. 83), and which was based on a one-time consultative examination, contains considerably less detail

regarding Plaintiff's prior medical history and offers no opinion as to whether Plaintiff could work an eight-hour receptionist shift without frequent breaks or periods of bed rest.  Thus, I find that the ALJ has failed to provide a "good reason" why the treating physician's opinions were not afforded controlling weight.[8]

As discussed above, ALJ Katz's finding that Plaintiff was incredible seems to have led him to disregard any evidence corroborating Plaintiff's testimony, including Dr. Hearns' report. If while on light duty Plaintiff spent at least two hours of his shift lying down on a cot, Plaintiff may be unable to perform a standard office/receptionist job of the sort that ALJ Katz recommended.  Because ALJ Katz failed to provide "good reasons" for failing to give controlling weight to Dr. Hearns' opinion, whether Plaintiff's physical impairments render him disabled as defined by the Act should be reconsidered on remand to the SSA, with the ALJ weighing the evidence as required by SSA regulations.

## IV.   Conclusion

For the foregoing reasons, ALJ Katz's decision is VACATED, and the case is REMANDED to the Commissioner for further proceedings consistent with this opinion.  The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs. 11 and 19), and close the case.

---

[8] The Commissioner argues that Plaintiff was "not as limited as Dr. Hearns claimed," as even Dr. Hearns reported that Plaintiff's range of motion had improved.  (D's Mem. 22.)  Even if Plaintiff's range of motion did improve, however, it does not necessarily follow that Dr. Hearns' opinion was erroneous.  Plaintiff testified that during a seven- to eight-hour light-duty shift he spent one hour sitting, approximately two hours lying down, and the rest of the time alternating between standing up and sitting down.  (R. 102.)  He further testified that at the time of the hearing, his back pain remained the same as when he was on light duty.  (*Id.* at 98.)  Consistent with Plaintiff's testimony, Dr. Hearns noted that Plaintiff requires bed rest and frequent breaks during the work day.  (*Id.* at 552.)  Thus, even with improved range of motion it is possible that Plaintiff will be unable to perform sedentary work.

**SO ORDERED.**

Dated:  January 2, 2014
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.